Filed 6/1/23  In re H.M. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re H.M., a Person Coming Under the Juvenile Court Law. | B314878 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 20CCJP06303A |
| Plaintiff and Respondent, | |
| v. | |
| B.M., | |
| Defendant and Respondent; | |
| H.M., a Minor, etc., | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steff R. Padilla, Judge Pro Tempore of the Juvenile Court.  Reversed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Appellant.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance for Plaintiff and Respondent.

---

Minor H.M. appeals a juvenile court order granting father reunification services and supervised visitation despite the juvenile court's finding that father raped H.M. on three different occasions beginning when she was 11 years old.[1]  (See Welf. & Inst. Code, § 361.5, subds. (b)(6)(A) & (f).)[2]  We conclude the court erred.  Because there was no evidence to support a finding that reunification was possible (as the juvenile court implicitly acknowledged), there was no reasonable basis to order reunification services under governing law.  And, because there was no likelihood of successful reunification, father had no right to visitation.  We reverse.

---

[1]  Mother's whereabouts are unknown and she is not a party to this appeal.

[2]  Statutory references are to the Welfare and Institutions Code.

After H.M. filed this appeal, the juvenile court entered an order terminating father's reunification services.  Nevertheless, H.M. and father agree this appeal is not moot because father has taken a related appeal from the order terminating services.  We likewise conclude this appeal is not moot, as we can grant H.M. effective relief by determining father was not entitled to reunification services in the first instance, effectively nullifying his pending appeal.  (See *In re D.P.* (2023) 14 Cal.5th 266, 277.)

2

## FACTS AND PROCEDURAL HISTORY

After father threw H.M. out of the home following a heated argument, the minor disclosed to her adult "stepsister,"[3] and later to law enforcement, that father had raped her three times. Law enforcement took H.M. into protective custody and contacted the Department of Children and Family Services (the Department). The Department placed H.M. in foster care and undertook an investigation to assess the safety of her minor half-sister.

H.M. told the investigating social worker father had raped her on three occasions, the first occurring when she was 11 years old, the second when she was in the seventh grade, and the last when she was in the eighth grade.[4] Each time father woke her in the middle of the night, said nothing to her, got on top of her, orally copulated her, and vaginally penetrated her with his fingers and penis. H.M. could not move because father was "very heavy." After the first incident, father apologized and told her it was " 'never going to happen again.' " He did not apologize after raping her the second and third times. The social worker reported H.M. was "visibly distraught and upset" when she recounted the incidents.

The juvenile court ordered H.M. detained from father's physical custody, set the matter for adjudication, and denied

---

[3]     Although they have no biological or legal relationship, H.M. referred to the children of father's live-in companion as her stepsiblings.

[4]     H.M. was 14 years old at the time of her detention in November 2020.

visitation, finding it would be detrimental to the minor's emotional health to order visitation with father.

A forensic nurse examiner interviewed H.M. regarding the rape allegations against father. H.M.'s responses largely adhered to the reports she gave to law enforcement and the Department, while providing more details about the circumstances of each rape and the emotional and physical harm she suffered as a result. H.M. said she finally disclosed the abuse because she was " 'tired inside' of holding it in." She was also worried father would abuse her younger half-sister.

H.M. spent her earlier years in El Salvador with her mother. Father had left for the United States when she was three years old. When H.M. was eight years old, mother left one morning and never returned. H.M. lived with her paternal grandparents in El Salvador for two years and then came to live with father in the United States when she was about 10 years old. She felt safe in her foster care placement and wanted no contact with father.

Father denied the rape allegations and claimed the evidence would prove his innocence. He maintained H.M. was getting back at him for kicking her out of the house after she posted inappropriate pictures to social media.

Before the adjudication hearing, the Department closed its referral regarding H.M.'s half-sister, after the girl's mother pledged she would no longer allow father into the home or allow him to have unsupervised contact with the girl. The district attorney had declined to file criminal charges against father, concluding there was insufficient evidence to secure a conviction. H.M. had received five months of individual therapy,

4

and her therapist recommended the girl continue with her weekly therapy sessions.

The juvenile court adjudicated H.M. a dependent child under section 300, subdivisions (a) and (d), and ordered her removed from father's physical custody. The court found the girl's account of father's sexual abuse was "devastatingly brutal and truthful." However, despite also finding H.M. was "a victim of severe sex abuse by clear and convincing evidence," the court denied her request to bypass reunification services. The court explained its reasoning as follows:

> "I'm not going to order conjoint counseling. I don't think it's necessary. . . . But there are other children. [¶] . . . I believe it's in [H.M.'s] best interest to have father determine whether or not he's going to accept what she says as the truth of what happened and how he treated her or not, but it's not going to be forever. [¶] . . . I find that this father is a clear and present danger to children—to this child and other children . . . . [¶] I think [the abuse is] so severe that, if the court doesn't offer him reunification services . . . so that he can figure out—so sex abuse counseling for perpetrators. It's to protect [H.M.] and other children. I'm not going to order parenting, but I'm going to order individual counseling for the father."

After ordering monitored visitation, the court reiterated its finding regarding the "ongoing sexual abuse of this child by the father." The court stated again that offering services and visitation was necessary to "protect [H.M.] in the future" and

5

to "protect other children that are siblings and half-siblings to [H.M.]."

H.M. filed a timely notice of appeal from the disposition order.

## DISCUSSION

### 1. *The Juvenile Court Erred in Granting Reunification Services*

H.M. contends the juvenile court abused its discretion by granting father reunification services despite finding he had repeatedly raped and physically abused her. We agree the court erred.

Section 361.5, subdivision (b) enumerates limited exceptions to the general rule that parents should receive reunification services whenever a dependent child is removed from parental custody. (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 63 (*Ethan N.*), citing section 361.5, subd. (a).) Specifically, section 361.5, subdivision (b)(6) authorizes the juvenile court to bypass services for a parent if "the child has been adjudicated a dependent . . . as a result of severe sexual abuse . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6)(A).) The bypass statute reflects the Legislature's recognition that some situations are so extreme as to require extraordinary caution in recognizing and giving weight to the usually desirable objective of family preservation, as well as lawmakers' determination that services should be provided only when they will facilitate the child's return to parental custody. (*Ethan N.,* at p. 65; *In re A.M.* (2013) 217 Cal.App.4th 1067, 1074; see also *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 (*Baby Boy H.*) [bypass statute reflects legislative recognition

6

that "it may be fruitless to provide reunification services under certain circumstances"].)

If the juvenile court finds a parent falls within certain paragraphs of the bypass statute, including section 361.5, subdivision (b)(6), "[t]he court shall not order reunification for [that] parent . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) At this stage, "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*Baby Boy H., supra,* 63 Cal.App.4th at p. 478.)

There is no dispute that section 361.5, subdivision (b)(6) applied in this case: the juvenile court adjudicated H.M. a dependent child as a result of the severe sexual abuse father committed, and father concedes the evidence compelled a finding that it would not benefit H.M. to pursue reunification services with father.[5] Accordingly, the issue, as the parties agree, is whether the juvenile court reasonably determined offering father reunification services would promote H.M.'s "best interest" under section 361.5, subdivision (c)(2).

---

[5] As father acknowledges, the court credited H.M.'s account that he repeatedly raped his daughter; this conduct and the circumstances of the abuse was undeniably heinous; H.M. suffered severe emotional trauma and had no desire to reunify with father; and there was no reasonable possibility that H.M. could be safely returned to his custody within 12 months without continuing supervision. (See § 361.5, subd. (i).) We agree with the parties that the evidence compelled a finding that reunification services would not benefit H.M. (See *id.*, subds. (b)(6)(A) & (i).)

"A juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child under section 361.5, subdivision (c)." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229 (*William B.*).) The juvenile court abuses this discretion when there is insufficient evidence to support the court's finding or when the court fails to apply the correct legal standard in making the best interest determination. (See *id.* at pp. 1228–1229; *Ethan N., supra,* 122 Cal.App.4th at p. 68.)

"The best interest of the child is the fundamental goal of the juvenile dependency system, underlying the three primary goals of child safety, family preservation, and timely permanency and stability." (*William B., supra,* 163 Cal.App.4th at p. 1227; accord *Ethan N., supra,* 122 Cal.App.4th at p. 66 ["The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' "].) The factors to consider include "a parent's current efforts and fitness as well as the parent's history"; "[t]he gravity of the problem that led to the dependency"; the relative strength of the bonds between the children and the parents and between the children and the caretakers; and "the child[ren]'s need for stability and continuity." (*Ethan N.,* at pp. 66–67 [citing cases].) When a juvenile court bases its best interest finding on factors that are not relevant to the primary goals of the dependency system, the court applies the wrong standards and abuses its discretion. (See *id.* at p. 68; *William B.,* at pp. 1228–1229.)

*Ethan N.* is instructive. The child welfare agency in that case argued the juvenile court abused its discretion when it found reunification would be in the dependent child's best interest

despite also finding the offending mother had caused the death of the child's sibling.  (*Ethan N., supra,* 122 Cal.App.4th at p. 64; see § 361.5, subd. (b)(4).)  The record showed the lower court based the best interest determination on its "concomitant finding that [mother] had 'made significant progress towards alleviating or mitigating' " substance abuse issues that led to her other children's removal.  (*Ethan N.,* at p. 65; see also *id.* at pp. 61–62.) The *Ethan N.* court concluded the lower court "did not apply the correct standards in examining [the child's] best interest and . . . thus abused its discretion."  (*Id.* at p. 68.)  Significantly, the juvenile court's finding did not address "[t]he gravity of the problem that led to the dependency"—the death of a sibling, which posed an "enormous hurdle" to reunification, nor did the lower court consider "the child's need for stability and continuity" given the unlikelihood that the mother would successfully reunify.  (*Id.* at pp. 66–68.)  Thus, while the evidence supported the finding that mother had made significant progress, "that same evidence did not provide support for the finding that reunification would be in [the child's] best interest."  (*Id.* at pp. 65–66.)

Similarly, in *William B.*, the reviewing court concluded the juvenile court "did not apply the correct standards when deciding whether reunification services would be in the children's best interests."  (*William B., supra,* 163 Cal.App.4th at p. 1228.) There, the juvenile court found the offending mother had a history of chronic drug use and had resisted court-ordered treatment for the problem, but the court nonetheless concluded reunification would be in the dependent children's best interests because "the boys had both testified they loved [the mother] and wanted to be with her."  (*Id.* at p. 1226.)  The *William B.* court

9

concluded this was error, explaining: "Most significantly, the juvenile court did not consider the children's need for stability and continuity. The children had been removed from both parents' custody three times and from the mother's custody an additional time. Under these circumstances, at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them. [Citation.] But the juvenile court's own comments confirm our reading of the record: There is no substantial evidence to support the conclusion that [the children] will reunify with their mother, thereby achieving permanency and stability throughout the remainder of their childhoods." (*Id.* at pp. 1228–1229.)

Here, as in *Ethan N.* and *William B.*, the juvenile court failed to apply the correct standards in determining reunification services would be in H.M.'s best interest. While the court declined to order conjoint counseling, it nonetheless found offering father individual counseling for sexual abuse perpetrators would advance H.M.'s "best interest" by giving her the chance "to have father determine whether or not he's going to accept what she says as the truth of what happened and how he treated her or not." That speculative possibility is irrelevant to the dependency system's goals of child safety and stability, and it has no bearing on the interests of H.M., who already knew the truth of father's sexual abuse all too well. (See *William B., supra,* 163 Cal.App.4th at p. 1227.)

Father's rape of his preteen daughter was beyond grave— it was a heinous betrayal of the parent-child relationship that

10

afforded no reasonable likelihood of reunification. Although the juvenile court acknowledged the gravity of father's misconduct, its consideration of the severe sexual abuse H.M. suffered focused primarily on protecting "other children" with whom father might still have contact, such as her minor half-sibling. This was a legitimate concern, but absent a finding that reunification efforts were likely to succeed, it was irrelevant to an assessment of whether *H.M.'s* best interest would be promoted by offering services to father. Far from finding a likelihood of reunification, the juvenile court expressly determined H.M. could not be forced to participate in conjoint counseling with her abuser, all but acknowledging the reality that father's grave betrayal consigned reunification efforts to certain failure. (Cf. *Ethan N., supra,* 122 Cal.App.4th at pp. 65–68 [evidence that mother " 'made significant progress towards alleviating or mitigating the causes of [her other] children's placement in out-of-home care' " was irrelevant to dependent child's best interest given "enormous hurdle" posed by gravity of mother's misconduct].)

The court also failed to consider whether H.M and father had the sort of bond that would justify efforts to preserve their fractured relationship. The record shows father left H.M. in El Salvador when she was three years old, and H.M. did not join father in the United States until she was 10. A year later father abused his daughter in the most odious way possible, and he continued to do so until she was 14 years old when he threw her out of the house. With no reasonable possibility of reunification and little more than a biological tie to bond them, the relevant standards for determining whether reunification services were in H.M.'s best interests simply did not support the court's exercise of discretion. (See *William B., supra,* 163 Cal.App.4th

11

at pp. 1228–1229 [even where significant parent-child bond existed, unlikelihood of successful reunification mandated bypass of services]; *Ethan N., supra,* 122 Cal.App.4th at pp. 66–68 [where gravity of parental misconduct poses an "enormous hurdle" to reunification "[n]o presumption in favor of the natural parent-child relationship obtains"].)

**2.** ***Because There Was No Reasonable Likelihood of Reunification, Father Had No Right to Visitation***

If a parent is denied reunification services under certain paragraphs of the bypass statute, including when the parent has sexually abused the dependent child under section 361.5, subdivision (b)(6), the court "*may* continue to permit the parent to visit the child unless it finds that visitation would be detrimental to the child." (§ 361.5, subd. (f), italics added.) The Legislature's use of the word " 'may' " is "permissive"—that is, it grants "the juvenile court discretion to permit or deny visitation when reunification services are not ordered, unless of course it finds that visitation would be detrimental to the child, in which case it must deny visitation." (*In re J.N.* (2006) 138 Cal.App.4th 450, 458 (*J.N.*).) This is a "logical distinction," as visitation is "an essential part of a reunification plan," allowing the parent and child " 'to maintain ties,' " while also " 'provid[ing] information relevant to deciding if, and when, to return a child to the custody of his or her parent.' " (*Ibid.*, quoting § 362.1, subd. (a).) "On the other hand, visitation is not integral to the overall plan when the parent is not participating in the reunification efforts. This reality is reflected in the permissive language of section 361.5, subdivision (f)." (*J.N.,* at pp. 458–459.)

Thus, where a parent is not entitled to reunification services under the bypass statute, he has "no right to visitation."

12

(*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 518 (*Korbin Z.*).) Under these circumstances, visitation may be ordered only if there is sufficient evidence to prove continued contact with the offending parent will serve the dependent child's best interest. (*Ibid.*; *J.N., supra,* 138 Cal.App.4th at p. 459.)

For the reasons discussed above, we conclude there was insufficient evidence to find continued contact with father would best serve to protect H.M.'s interests. In view of their long estrangement and the abuse that began only a year after H.M. joined father in the United States, there was no substantial evidence of a bond between H.M. and father to justify an order compelling her to have continued contact with her abuser. While H.M. was doing well in foster care by the time of the disposition hearing, the record shows this was due to her having a protective caregiver, a thoughtful therapist, and no contact with father for approximately eight months. As there was no reasonable likelihood of reunification, we conclude forcing H.M. to have any contact with father, whom the juvenile court concluded had severely sexually abused her, would jeopardize H.M.'s emotional safety. The juvenile court abused its discretion in ordering monitored visitation. (See § 362.1, subd. (a)(1)(B) ["No visitation order shall jeopardize the safety of the child."]; see also *J.N., supra,* 138 Cal.App.4th at p. 459 [denial of visitation was justified where, due to mother's incarceration when child was two years old, it could be inferred they were "not bonded" and "they [did] not have a strong relationship"]; *Korbin Z., supra,* 3 Cal.App.5th at p. 519 [child's "opposition to visits" with offending parent is relevant to determining whether visits are in child's best interests].)

## DISPOSITION

The portions of the disposition order granting father reunification services and monitored visitation with H.M. are reversed and vacated.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


BENKE, J.*

---

*     Retired Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.